We believe that Mr. Jasper is entitled to a new trial and that in any event, the Sarbanes-Oxley 304 forfeiture must be set aside. If I may, let me start with the Fifth Amendment. This Court's leading precedent, the Glanzer case, says that an adverse inference from the defendant's invocation of his Fifth Amendment rights can be drawn in a civil case, but only in the narrowest of circumstances. It can't just be a broad inference that the defendant must have done everything he's accused of because he invoked.  Ginsburg. Counsel, how many times did your client take the Fifth? Jasper. Hundreds, Your Honor, because the ordinary practice of the Fifth Amendment is not the case. Ginsburg. Are you suggesting that the district court judge had to stop each time and question him? Jasper. No, Your Honor. All of the invocations were he didn't take the stand at trial. All of the invocations happened at depositions and in response to written discovery in the case. And what happens in a case of this nature is that the government takes the discovery that they took, in which the defendant routinely takes the Fifth in response to every question. You can't do this piecemeal or you risk waiver. You have all sorts of other problems. So what happens in a case of this nature is the defendant takes the Fifth in response to every question, and then the government has, frankly, as many invocations as they care to generate because they can keep him up there and ask him, you know, whatever they want, carefully tailored questions, and then he'll invoke until the end of time. And then what's supposed to happen in a case like this one? I think Judge Ellis's very thoughtful opinion in the Custer Battles case in the Eastern District of Virginia shows you how this is supposed to happen. There, as here, the government asked the defendant hundreds of questions, provoked hundreds of invocations. I'm sorry, it was a civil plaintiff. Provoked hundreds of invocations. And then came into court and said, we want to introduce these 17 with the corresponding invocation as evidence of an adverse inference. And Judge Ellis said, no, you know, go back and tell us what you really need. So they came back with six. And then the district court wrote an opinion where he explained, going through this court's Glanzer analysis, he actually applied this court's leading case because it's the most cogent appellate decision in the country on these issues, and cut it down to three. And he reasoned that when too many invocations are introduced, there is, quote, a danger that at some point the jury will become deaf to the substance of the questions asked and unanswered. And as a result, the specific inferences that are appropriately drawn will blur into a single inference that the defendants have committed all of the acts alleged. So we cut it from six to three and then let the plaintiff introduce those three in a very targeted way and make targeted arguments for an adverse inference tied to the substance of those particular questions. Here, by contrast, the government offered and admitted into evidence over the defendants' repeated objections literally hundreds of separate invocations of the privilege. And in response to questions that could not possibly satisfy this Court's Glanzer analysis, questions that were too vague to support any properly confined inference under the Glanzer test, questions on which the SEC had no independent evidence, which is another important element of the Glanzer analysis, questions as to which they had no substantial need for an adverse inference. It was a blanket. Let me give you just a handful of examples, Your Honor. Let me ask a question before we get too far into that, if you wouldn't mind. Judge Ware is a fine trial judge, experienced, now chief judge, so he's been around long enough to get to be chief. He took a position where he would allow the in limine discussion with all of the data, and they were all there. What position did you take before Judge Ware? Did you ask for 3 or 6 or 10 or what? Well, we asked we're not the proponent of the evidence. It's the party offering it. That wasn't the question. Right. But our, by way of explanation, our position was that the SEC had not laid the foundation to introduce any. So, yes, and I understand that. And they decided against you, so all came in. But at what point in this discovery process did you raise this issue, citing some cases or whatever you want, to give Judge Ware the understanding that you were also interested in cutting them down to just a few and make your argument to him? When did that happen? Consistently throughout the proceedings, Your Honor, including our motion to eliminate before trial, our renewed objections. And in the eliminate before trial, how many did you ask for, to be limited to how many? We were asking, Your Honor, that they all be excluded or that the SEC be required to actually attempt to satisfy the requirements of the Glanzer analysis for whichever particular questions they wanted to enter. Our consistent complaint throughout citing the Glanzer analysis was that the SEC was refusing to engage in the question-by-question proffer that the Glanzer case requires. And the SEC refused to engage in that analysis. They insisted on treating it in a broad-brush fashion. I understand. Now, you've told me what I knew, because I read your brief very carefully. But I'm trying to find out, where was Judge Ware advised that you would like to have some broad-brush analysis of the Glanzer case? Well, I think in our motion to eliminate before trial, the SEC said, well, you know, if you're going to do one of this analysis you talk about, instead of coming in with a whole tidal wave, you'd like to see 20 or 50 or 100. Where was he put to that chore? I think in our motion to eliminate before trial, the end of the trial. And what was the nature of your request to Judge Ware? Well, the nature of our request was that if the SEC wants to introduce these questions and invocations, they have to do it, the analysis, on a question-by-question basis and be more targeted. And they refused to engage in that analysis. We couldn't do it for them, Your Honor. We couldn't say, you know, here are five or six that we're going to do it. Well, usually what happens, we have something you can tell me, either something in the record where you've discussed this with Judge Ware, or a motion that you bring that specifically asks him to please limit these to 25 at the most or whatever. Your Honor, I believe all of the motions that we filed, and I would urge you to read our motion to eliminate that was filed before trial and the renewed objections that we filed the night before the deposition transcript was played. In both instances, our argument substantively was, given the proffer that the – our opponent has made, and they are the – they have the burden of laying the foundation for the necessary evidence, against the current backdrop, none of these invocations can be admitted. If they wanted to admit something, they would need to lay a foundation, and it would need to be on a question-by-question basis. We didn't – I understand that. But your – that motion is all or nothing. Well, it was – You're asking Judge Ware to say, absolutely not, or go through all this process. But I'm trying to – what I'm trying – you asked – you talked about this district judge, and it sounded like a reasonable approach. I'm not sure that issue was really before Judge Ware that we were going to take 10 representative questions or 20 representative questions and – and to try to do that, which is apparently what this judge did. Well, with respect, Your Honor, I believe that it was the SEC's burden to attempt to lay the necessary foundation. You weren't going to bid against yourself. We can't bid against ourselves. And we couldn't do – we couldn't do the analysis even if we wanted to, because it would require identification of the inferences that our opponent wanted to draw from these vague and open-ended questions. We didn't know. One of the complaints that we made consistently to Judge Ware was that the SEC refused to specify what inferences they hoped the jury was going to draw from, for instance, here's one of the questions that they introduced, ER 2273, quote, from May 1, 1998 through January 31, 2007, please describe in detail the process by which options grants were made at Maxim, including without limitation the identification of all relevant people, documents, and communications. Well, the information – That was in your brief. That was a very interesting question. I mean, the information potentially being sought by that question relates to every potential issue in this case over a 9-year period. We asked the SEC, what adverse inference is it that you are hoping the jury will draw from this question? Is that a question on deposition or an interrogatory? It was an interrogatory response. And there are several others. There's a – at 2347, there was a question, admit that Maxim restated financial statements for 2002 through 2005 as a result of misconduct. Well, that's not a question about narrow, specific facts. It's, again, a question about every fact in the case. And even worse, it's a question about the ultimate issue in this case under the Sarbanes-Oxley count. So I think the panel understands the Fifth Amendment issue. The second main pillar of the SEC's case was the admission of Maxim's restatement. The SEC relied on Maxim's restatement as proof of just about every factual issue in this case. But these are just the hearsay conclusions of Maxim's management and a group of outside lawyers and accountants on the same issues that the jury was intended to decide in this case, but applying the wrong standard of proof and putting the burden of proof on the wrong party. Now, it's not a business record, because as this Court recognized in the Paddock case, a business record has to be routinely compiled in the ordinary course of business, and a special audit conducted only upon suspicion of past wrongdoing is not routine. Was this only a special audit, or was there an annual audit anyway? Well, an annual audit may have been wrapped into the – this 10-K that was filed for that year, for the immediate year, but that's not why the SEC introduced the evidence. The part of the restatement they were interested in, and that was potentially probative in this case, was the restatement going back 10 years of past financial reports. And a massive investigation into suspected wrongdoing stretching back 10 years and leading to an $800 million accounting restatement is not something that anyone does in the ordinary course of business. This wasn't even Maxim's regular auditors or lawyers. It was a whole new crowd of people that they hired specifically to do this. It was an – But Mr. Jaspers had resigned. They had to get another CFO, didn't they? Well, they had had a different CFO, but these weren't even the regular accounting firm that had routinely prepared their accounting statements up until this point. And it wasn't remotely compiled, as Rule 8036 requires, at or near the time of the events that it's purporting to record. The truth, the business records of Maxim's options granting practices in this case were the notes that the CEO, Mr. Jack Gifford, sent to the Stock Administration Department at or near the time of events saying, I granted the stock options on such and such date. But the whole premise of the restatement was that the auditors decided that those contemporaneous business records weren't reliable and had to be discarded. And so what they did was go back and conduct an extraordinary once-in-a-lifetime kind of special audit of the sort that this Court held in the Paddock case is not admissible as a business record. That was the one where it was prepared for trial. Well, it was prepared potentially in anticipation of litigation. But this Court's opinion in the Paddock case has two sections. The first section concludes that it doesn't meet the special audit prepared in upon suspicion of wrongdoing, doesn't meet the basic requirements of the business records doctrine. This Court then went on to say, and in any event, as an alternative holding, it would be excluded on reliability grounds because there's a separate concern with anything that is prepared in anticipation of litigation. Of course, this audit was prepared under the shadow of massive litigation as well, so it's not really a distinction. Can an audit ever be a business record? Well, I think ordinary periodic financial statement audits that are filed on 10Q. How would this be distinguished from that? Well, so the ordinary 10Q is filed every quarter routinely in the ordinary course of business from information that the auditors gather, the company and the auditors gather at or near the time of events from the people who have been recording, you know, the company's earnings and balance sheet information. And it's compiled and it's filed every quarter. And then once a year there's a 10K that rolls it all up. That is something that every company does in the ordinary course of business. The difference here is that this was an extraordinary once-in-a-lifetime event which concluded that the actual routine contemporaneous business processes that the company had engaged in, you know, over a period spanning 10 years, were suspect and couldn't be trusted. And so it wasn't compiled routinely or in the ordinary course of business or anywhere near, at or near the time of the relevant events. It's not our standard review. It's not the standard course of business to correct statements? It is a legal duty to correct misstatements, but it's not something that any company does routinely or in the ordinary course of business. Isn't that something they should do? It's something that they should do if it happens, but God help us if it's routine. In other words, the ordinary course of business is to bury mistakes until an extraordinary audit takes place? Well, Your Honor, the hope is, in the ordinary course of business, that nothing like this would ever occur. And it's certainly not routine. If men were angels, we wouldn't need governments. Absolutely, Your Honor. You know, that line of reasoning, Your Honor, which is essentially the SEC's argument that anything prepared pursuant to a legal duty should be admitted because it's very reliable, misses the fundamental requirements of the business records doctrine. Audits always use outside auditors, don't they? That's why you have an audit. Oh, yes. Absolutely. But in a manner that is routine in the ordinary course of business and at or near the time of events. Remember, this was 10 years later. Your position is that if a mistake is found or if a defalcation takes place, the investigation of that is no longer an ordinary course of business? Well, this Court held that a special audit conducted only upon suspicion of wrongdoing is not an ordinary course of business. Now, in the course of the Paddock case, Paddock v. Dave Christensen, this Court's leading case on the question, if the issue is a problem that is caught in the course of the ordinary quarterly, you know, processes of the company and it's corrected, then no special audit initiated upon suspicion of wrongdoing has occurred. All that has happened is the company's ordinary business processes. But you can't say that an audit that is conducted 10 years later by a legion of new outside forensic accountants and attorneys is something that happens in the ordinary course of business for any company. If you cite the Paddock case in your brief, I don't have it with me. Yes, Your Honor. It's Paddock v. Dave Christensen, 745 F. 2nd 1254. And the other problem with the argument is that the SEC's argument fundamentally misunderstands what this restatement was. The restatement, I'm sure, is reliable evidence in that they did a fair and good-faith job with the question that the auditors were asked to answer. But what they were asked to do was not to compile a reliable contemporaneous record of the substantive events. They started from the conclusion that they had no reliable records from the company, actual contemporaneous records from the company. And then they had to look at the generally accepted accounting principles and some guidance that the SEC Chief Counsel's Office issued in 2006 to decide how, as accountants, they needed to account under GAP, generally accepted accounting principles, for options grants under conditions of documentary uncertainty. If you don't have any evidence, what do you, as an accountant, do with that? Well, apparently what you do is apply extremely conservative principles. You put, essentially, the burden of proof on the company to supply reliable contemporaneous documentation. And if the company can't supply it, then you push the measurement date out for the option to whatever point in time the company is able to reliably document all of the information. Well, that leads to extremely conservative results and a very high accounting restatement. The other thing that the accountants did here that I think it's very important for the Court to understand, they didn't distinguish between actual backdating and a technical accounting problem. They counted an option as backdated if the grant date was perfectly honest, but the share numbers that the employee was getting were potentially subject to revision in a later employment review. That's not backdating. It's not fraud. It's not the issue here in this case. It's a technical disagreement among accountants that wasn't resolved until the SEC issued guidance in 2006. What's the difference between backdating if the date today, the price is selling it, the stock is selling at 50, and you backdate it to a date when it's selling at 25? That's case one. In the other cases, instead of giving them 100 shares, you give them 200 shares. The effect is the same, isn't it? Well, Your Honor, this Court explained in the Reyes case that backdating is choosing the date with hindsight. The latter problem is an accounting issue that so the auditor at the company at the time, the accountants at the company, and at a lot of other companies, believed that if you had share numbers that followed a formula, generally following the employee's job status and his salary, that that was good enough to fix the number for purposes of choosing the grant date, even if there was potentially some tinkering around in the margins. This is at SCR 34, I believe, is the SEC's guidance that they issued in 2006, where they explained that we know a lot of companies have been doing it this way. We think it's wrong now, and going forward, we want everybody to have absolutely firm share numbers before it's fixed. But the SEC never tried to argue in this case that that issue is fraud or that it could be a violation of the securities laws. That wasn't submitted to the jury. Their theory was actual backdating. The problem is that the restatement didn't disaggregate the two. All that the restatement really was was the hearsay conclusions of a different group of fact-finders, applying a different set of factual proof standards, accounting standards rather than general fact-finding instructions, and putting the burden of proof on the wrong party, the company rather than the SEC. Properly understood, this really should have been excluded under Rule 403B, even if it had been admissible as a business record. Now, in any event, we believe the Sarbanes-Oxley forfeiture has to be set aside. This is a cause of action that the SEC can prove to forfeit a CEO or CFO's bonus if there has been a restatement, but it's only for the 12-month period following the first financial statement that was wrong. The SEC concedes on appeal that this jury's verdict under the verdict form that was used could rest entirely on a options grant that would not trigger any forfeiture obligation under that cause of action. The district court tried to save them from that omission after the trial by making its own findings, but this is legal relief, not equitable relief. So under the Seventh Amendment, the jury had to make the necessary findings or not at all. I think there's isn't there a case that says it's equitable, an equitable remedy? This Court's decision in the Digimart case in dicta indicated that it was an equitable remedy, but it's not a holding. And at that point, it's clear from the opinion that this Court believed that what the statute required was the disgorgement of ill-gotten gains from a wrongdoer. The SEC has subsequently clarified that the statute requires nothing of the sort. It doesn't require proof that the defendant is a wrongdoer. It doesn't require proof that the gains in question were ill-gotten or traceable to the violation in question. They have subsequently made very clear that this is nothing but a penalty imposed automatically, essentially strict liability. And they have charged it repeatedly in other cases as the only count in their complaint and against the CFO in order to forfeit the bonus. Here they just simply failed to request jury instructions on the question. I see that I'm out of time. I have other things I'd love to address if Your Honor wants to hear them. The request made to Judge Ware that this would be a jury question? We argued in post-trial motions that they couldn't. I meant pretrial. Pretrial. We demanded a jury trial on all issues. We didn't single this issue or any issue out. So how did he handle that you asked for it and you got it and now you're objecting? Well, no. We requested a jury trial on all issues. We did not get a jury determination on this issue because the SEC defeated a verdict form that we had requested, Your Honor. I see. If you look at FER 9 to 10, we requested a verdict form that would have required the jury to break down on a grant-by-grant basis which grants they thought were backdated with my client's scienter and that were material. So in that, if that verdict form had been granted, would have allowed the judge to straight-line each of those options grants to the first financial statement that would have been affected. He could have imposed this penalty if the jury's findings made it appropriate. The SEC didn't want that because what they wanted was a broad, undifferentiated general verdict on each of the provisions of the securities laws that they say were violated here. So they're relying on a Rule 49A3 to argue waiver on appeal. It doesn't apply here because this was a general verdict, not a special verdict. Even if it applied, we satisfied it. And even if somehow we didn't satisfy it, the law is that it only allows a judge after the fact to supply omitted subsidiary findings on issues that the jury really resolved, but just that the verdict form didn't spell out. Okay. Thank you very much. I realize I thought you said patent case. The patent case. I'm sorry. I'm very familiar with it. Sorry. Thank you. Dominic Frieda on behalf of the Securities and Exchange Commission. If I could just start with the SOX 304 point. This Court clearly held in White v. McGinnis, which we cited in our brief, that a party waives its jury right by acquiescing in the court determining the issues in a bench trial. Here it's clear that they did so, and it's most clear if you look at the joint pretrial conference statement, which was docket number 132 at page 5. It listed SOX 304 as, quote, equitable relief to be determined by the court. Jasper never argued that he wanted the issue submitted to the jury at any time before the appeal, not before the jury was instructed or discharged, not in briefing the SOX 304 issue before the district court, not during the district court's remedies hearing. SOX 304 was discussed. Regarding the fact of then just going, I guess, going in reverse order. Regarding the restatement, this Court's holding in Haddock actually recognizes that financial statement audits and that the results thereof are admissible as business records. In order to get to the point where they would find it inadmissible, Jasper argues that it lacks routineness. But as this Court recognized in SANA, I mean, putting aside the fact that we believe this is a routine function to audit your financial statements and to produce public filings both quarterly and annually, but putting that aside for a moment, this Court clearly held in SANA that the routineness which comes from the advisory notes to the rule is established when you have a legal duty to investigate or to produce the report. And, in fact, if you look at the advisory committee note on the rule, it says exactly that the element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity, which produce habits of precision by actual experience of business and relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation. The note then goes on to say that a very limited discussion or view of what is in the ordinary course of business is not the intent of the rule. The intent of the rule was to be more expansive because the routineness, the result was a tendency under the law, under the common law. Unduly to emphasize the requirement of routineness and repetitiveness. And in an instance, other types of records be squeezed into the fact patterns which give rise to traditional business records. So your contention that Maxim every year would audit the backdating of options? Well, every year they audited their financial statements. And for the prior years they had misrepresented and omitted to include the compensation expense that was required to be included under APB 25. So in 2006, after discovering the facts or in the process. Those auditors hadn't caught that? No, they hadn't caught that. So we had some new auditors come in? Well, there was information that was discovered beforehand that triggered the special investigation by the board of directors. And then at that point, yes, auditors were brought in to go through the books and to determine what was in fact the correct compensation expense to put on these, on the books at that point. And so they had to go back and restate them all, which is required by, as we point out in our brief, required by securities laws. The process, moreover, is the same. It may be different in magnitude because you're now looking at a larger period. But the process of auditing your financial statements is exactly what the company had to do every year. And similar to the quarterly review that they would do. So this is the same process that produces a business record. And no one disputes the fact that the audited financial statements are business records. In fact, Paddock recognized that. Paddock held that. Unlike the special audit in that case, a financial statement audit is admissible as a business record. In addition, if you go back to the first question, or actually, Judge Bea, I wanted to also pick up on something that you pointed out. It isn't the ordinary course of business in order to make inaccurate and misrepresentations in your financial statements. The ordinary course of business is to accurately do so. And the legal duty is to go back in time to correct those when there is a misrepresentation made. And that is exactly what happened here. Is that directed by GAAP or directed by the SEC rulings? Both. It's both within GAAP and there's a reg at SX. So it's the commission regulation. And as you may be pointing out, GAAP and GASP apply both in the restatement auditing process as well as in the initial processes in which they initially restated their financials. So it's the same counting rules that are applied. It's the same requirements. And, therefore, that ensures the reliability. What was the level of review of the auditors? The level of review? Was it compilation? Was it certified? What was the level of review? They would have to sign off on it, certified, at the end of the audit process. The auditors? Yes. Was it an independent review? Yes. Using their occasional check methods? I believe so. Not compilation, simply taking what the company told them? No. I mean, the auditors do an independent review and then they have to give their opinion on it. So after the process was done, they finished their auditing and they gave an opinion that it was represented and consistent with GASP and GAAP. And so I'm hoping that answers your question. It does. Okay. So this is exactly what you have the business records exception for. And certainly what Judge Ware did here in no way constitutes an abuse of discretion. He recognized the correct rule, he applied it, and he came to reasonable conclusions based upon the facts in the record. If you want to. And our scope of review on this is abuse of discretion? Yes, it is. And then if we want to touch on the first point, the Fifth Amendment point, if there are no further questions, on the restatement issue. The position, Judge Wallace, you are correct. The position below from Jasper was an all or nothing approach. These were invocations that Jasper had taken in his deposition and then in written discovery responses. And the Commission took what was two days of depositions in which he invoked as to names, rank, and serial number. But then whittled that down to about a half hour. And they had two motions of limine on the process. And at no point did Jasper ever argue for a specific invocation to be excluded. He said none of them would be justified under this Court's precedent. The burden of proof is on you to justify them. Yes, that's true. But we believe we did. We demonstrated that there was independent evidence of the invocations. And this Court's holding in Glanzer suggests that what is at issue is a concern with speculative inferences. And that's not what we have here. You know, as I said, at no point did they point to something for Judge Ware to look at and say, you know what, that may not be admissible under Glanzer. And so ---- How many times did he invoke as Fifth Amendment during this process? You mean how many were admitted or how many did he invoke as in total? Total. Oh, it was two days of testimony that he invoked and an additional written discovery. I never did the calculation as to that, but I would imagine it could be ---- I mean, if there were hundreds that were admitted, 170 were admitted to the Court, you extrapolate that out, it could have been 1,000. So 1,000 times he evokes, and then you take 170 of those for trial. Right. And that the 170 was what was at the in limine motion? Yes. They were presented to the Court, yes. And what was presented to Judge Ware as to the validity of those? I understand that you had attachments made to them. Is that correct? Yes. They were provided to him. And at this point, was there individual objections made to any of them by the defendant or was it all a total objection? My collection of the record is that there was an all or nothing objection, that their position was that none of these invocations were admissible. Okay. Now, how did you argue that they were? What position did you take before Judge Ware? The position we took before Judge Ware was that the questions fit the glands or factors, so Judge Ware considered the appropriate test and applied it. And so we presented to him the, you know, as we said, the attachments, and we argued that these would, you know, we did our job, we argued that these satisfy the glands or factors, and Judge Ware, you know, took it under advisement and came back with his ruling. So in your in limine presentation, you took each question and made a determination of what is liable to, where it's going to end up with an inconsistent statement or whatever? We didn't go one by one. We didn't go through them individually. Did you go by the, were they in groups? We didn't group them. So then you just said glands or, these are 170 questions, apply glands or, and that's it? Well, what we said was, these are the questions, we've gone through them, they pertain to Jasper's knowledge of what is the backdating that occurred during the relevant time period, and that there's a substantial need for that because he's the only person who has the ability to give direct evidence regarding his knowledge. Not every question had to do with backdating in the relevant period. Well, some of them had to do with, true, I mean, some of them had to do with. Question. Can you tell us when you first became acquainted with Maxim Integrated Products? That's when you first heard of the company's name. Right. What does that have to do with that? Well, the fact that he refused to answer the question based upon his Fifth Amendment right, the jury was entitled to adversely infer that his answer, if truthful, would have, could have tended to incriminate him. That's the basis of his indication. This notion that he could. As to backdating, when he first heard of Maxim, if he'd opened the Wall Street Journal. Oh, I thought the question was when did you first become acquainted with. Became acquainted with Maxim Integrated Products. I was taking that as. That's the company. Employed with. Yeah, I mean, he, well, perhaps that may have been. What does that have to do with backdating? Well, that was when he became acquainted with Maxim. Could have become acquainted with Maxim by opening up the Wall Street Journal. Well, that, so that may have been a bit of a vague inference to draw from this. Vague. But I would argue that there is, you know, what would be the harm that the jury would infer anything negative from that then? If there were questions to the extent that they were ambiguous as to the inference, then it would have been a harmless error. So what you're saying is that you gave Judge Ware 170 questions. You gave him, I take it, a memorandum of points and authorities laying out the glands of factors. And you didn't distinguish the application of any of the glands of factors to any of the questions. And you said to make up your mind, Judge. Not in so many words. But we did attempt to connect them to Jasper's knowledge of the backdating scheme that went on at Maxim. Well, if a question doesn't ask anything about the backdating scheme, how can that relate to the backdating scheme? Well, some of them are first questions in a step, in a process. I'm unfamiliar with the one that you're pointing to. But that, I mean, let's step back for a moment and categorize them. The majority of the questions asked asked Jasper to identify a document or his relationship to it, which is exactly what Glanzer has in mind and exactly what Baxter v. Palmagiano had in mind. And then the follow-up question takes up the next largest number of questions, the follow-up question being, when you wrote or received this document, did you know that the gate was improper? And that's the next largest category of questions. So I would argue the bulk of these were absolutely justified under Glanzer. If there may have been a few stray that were admitted that may not have satisfied the glands of factors, then we believe that would be harmless error. As I went through the questions, I saw a number of them as foundational questions leading up to other than foundational questions. But what you're saying, even though it didn't directly deal with backdating, was seen to show the knowledge of the person being asked, of Mr. Jasper. Am I correct on that? Yes. That's what I believe. How would I know that the national standards were followed? How would I look at the record and say, yes, the national standards were followed? You mean nationwide? Yeah. By looking through the fact that at no point has Jasper come up with what I believe is an indication that demonstrates that it was improperly admitted and would have been prejudicial to him for having been done so. I mean, Judge Ware saw this issue twice in motions and limine at trial, twice again, and then in post-trial motions. I understand that. But we're talking about admission into evidence. And so people look at things and people look at things. But it seems to me that for 170 questions, there has to be a determination of the national standards. Now, ordinarily, the government isn't giving us 170. This is the first time I've seen 170 in a case. But there still is a national, a nationwide, what is it? It's nationwide. Nationwide standards that have to be followed. Now, what did you present to show the nationwide standards were there so that Judge Ware could look at it and make a determination? Well, as I said, we connected the invocations to the pertinent documents and argued that it was all relevant to his knowledge of what occurred at the company. And we demonstrated that under the law, under this Court's holdings and under Baxter, the jury was entitled to hear this evidence and to be instructed that they could but were not required to take an adverse inference from the fact that Jasper refused to answer these questions in the face of incriminating evidence. But you were doing that as a large group of 170. And tell me why it is that that passes muster. It seems to me that because the questions are different, in some ways, the standards may be different. That may be true, Judge Wallace. But I think, as I said, I haven't seen, aside from the one that you came up with, I haven't seen Jasper come up with anything that demonstrates that Judge Ware didn't do anything out here. So really what you're relying on is to put the whole 170 out, give a generalized meeting of the standard, and then wait for an objection. And then your response to us would be, but they didn't object, and so there's no clear error. That's correct. I mean, they didn't object to anything in particular. You know, Judge Ware was looking at this issue. I mean, they have to alert to him if they think that there isn't a specific indication. It's a difficult issue because this stuff's dynamite. When I was a trial judge, I worried about it all the time. You can instruct all you want to to the jury, but it's a dynamite. And Judge Ware took some time on it. Did he, so far as we know, he went through the questions, the 170 questions? Yes. He did, as far as we know. And if you think about it for a moment, I understand Glanzer and Nationwide look at this from the perspective of an individual question, question-by-question basis. Go back to Baxter, though, and look at Baxter. Baxter doesn't require, I mean, it was a disciplinary hearing in a prison in which the prison authorities put forth their evidence and they asked the prisoner, do you have anything to say in your defense? And he said, I plead my fifth. They then took an adverse inference from that, and it was the ultimate adverse inference. This is much more careful what the court did here, and the Supreme Court said that was fine, that you could take an adverse inference of such an ultimate issue in the case based upon just the mere blanket refusal to testify so long as there's incriminating evidence to support that. And that's what we have here. So we have individual questions that satisfy this Glanzer and certainly Baxter, if you go back that far, and justify instructing the jury that they could but were not required to take an adverse inference from Jasper's refusal to testify. Could I ask you about one other issue that hasn't been argued by either side? That's the Maxims' former treasurer. As I understand it, he gave a statement under oath, then grabbed the fifth, and that his testimony was given in trial, right? His testimony was excluded from trial. The testimony that he gave was during the commission's investigation, and they call in individual witnesses when we're in a fact-gathering phase before we have had a discussion and have any targets or focus on our investigation. He didn't give a sworn statement to the investigators? Yes. He gave testimony. And that was what was used in evidence? That was excluded from the trial. Judge Ware concluded that the commission had neither the motive or opportunity to challenge his testimony when given. So you objected on hearsay grounds? Yes. All right. I don't have anything else. I have no questions. Thank you. Thank you. All right. Counsel will give you two moments, all right? Just a quick, a few quick points about the record. It's not really fair to say that we didn't object to any individual questions. We couldn't go through and do a question-by-question analysis for the reasons that I explained earlier. By the way, I think it was a lot more than 170. I think there were 170 at the deposition excerpt that they played. But then they dumped into the trial all of the answers to written discovery as well. And so I think we're talking about a much larger universe. But what we did in our briefing below, and what the SEC never did, was give Judge Ware some examples of things that we thought were improper to help guide his analysis of the Glanzer factors. So if you looked at the ER 347, for instance, we pointed out as an example, for example, the SEC seeks to admit over ten questions posed to Mr. Jasper, such as did you draft this memo, did you ever receive this memo, at the time you received this memo, did you understand that it was false, what Your Honor characterized as foundational questions. And then we explained these questions were not supported by any, quote, independent evidence as required by the Glanzer analysis at Mr. Jasper's deposition, and indeed the SEC hasn't offered any. On page 348, the next page, we explained that the SEC was ignoring the fact-specific nature of any adverse inference that had to be drawn and asking vague questions. And then we gave Judge Ware another list of examples of questions that they were introducing, like could you tell us a little bit about your employment history, can you tell us when you first became acquainted with Maxim Integrated Products, what did you understand Mr. Gifford to be asking to you, why did you write that, what did you mean. So we couldn't do every single one, but we explained what the Glanzer and Nationwide analysis required. We gave Judge Ware some examples of why what they were trying to introduce couldn't possibly satisfy it. And then we called upon them to fulfill their burden as the proponent of the evidence to come forward and justify each of these on a question-by-question basis. If you look at ER 490, that's their opposition to our motion. And I think if you review it, you'll see that they never engaged in the proffer that they needed to engage in. They've raised for the first time the, you know, now this question of harmless error. This error couldn't possibly be harmless. The burden is on them, and this Court has said that you can't engage in harmless error analysis when it would just be an exercise in speculation. In this case, under these circumstances, we don't even have any idea what issues in this trial were infected by the Fifth Amendment error, because the nature of these questions and indications is so broad and expansive that the jury may well have drawn an adverse inference on every single issue in the case. So there's just no honest way to perform harmless error analysis in these circumstances. On the restatement that you pointed to, the Sana case, that case is perfectly consistent with our position here. The Sana case did point to the fact that the record was prepared under a legal duty as evidence supporting the reliability of the record. But in that case, all of the other requirements of the business records doctrine were satisfied. It was a record of an insurance adjuster's report, and insurance companies adjust claims in the ordinary course of business at or near the time of the relevant events. So it's not consistent with their claim here. Their theory, really, is that anything that is prepared pursuant to a legal duty that has an issue of reliability is admissible. But that's what we have Rule 807 for, the residual exception to the hearsay rule, which was not satisfied here. Judge Wallace, you asked a question about the exclusion of Mr. Ruley's testimony. The SEC argued and Judge Ware agreed that it could be excluded under Rule 804b-1 because the SEC didn't have the same motive and opportunity because it was just at a fact-finding stage of the investigation and they didn't know as much as they later knew at trial. That's exactly the holding of the district court in the McFaul case, which this Court reversed. In that case, the government was relying on a string of Sixth Circuit cases that argued, as the government is here, that if there's really any meaningful difference in the government's motives and opportunities, then it can be excluded. This Court embraced a line of D.C. Circuit precedent related to, I mean, represented by a case called United States v. Miller that said that it had to be, that it was enough if they had basically the same motives, they were on the same side of the case. I see I've exceeded my time. Thank you. You bring this reign back with you from London? I'm afraid that I did, Your Honor, and I do appreciate the extra day. The case of SEC v. Jasper is submitted and will stand adjourned until 9 o'clock tomorrow morning.
judges: Wallace, Nelson, Bea